# United States Court of Appeals
## For the Eighth Circuit

_____

No. 99-3248

_____

| | |
|---|---|
| Genon Crook, Personal Representative of the Estate of KENNETH E. CROOK, Deceased, | * <br> * <br> * <br> * |
| Plaintiff-Appellant, | * <br> * |
| v. | * Appeal from the United <br> * States District Court |
| KANEB PIPE LINE OPERATING PARTNERSHIP, L.P., a Kansas Partnership, FARMLAND INDUSTRIES, INC., a Kansas corporation; and FARMER'S COOPERATIVE BUSINESS ASSOCIATION, a Nebraska corporation, | * for the District of Nebraska <br> * <br> * <br> * <br> * <br> * <br> * |
| Defendants-Appellees. | * |

_____

Submitted:  May 12, 2000
Filed:  November 7, 2000

_____

Before McMILLIAN, BRIGHT, and WOOD, Jr.,[1] Circuit Judges.

_____

WOOD, Jr., Circuit Judge.

---

[1]The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by designation.

Kenneth E. Crook, a resident of Nebraska, was killed as a result of a propane gas leak and explosion on October 11, 1994, at his place of employment, Farmer's Cooperative Business Association (the "Coop"), a Nebraska corporation.[2] Crook's estate sued the Coop, Kaneb Pipe Line Operating Partnership, L.P. ("Kaneb"), a Delaware corporation with its principal place of business in Kansas, and Farmland Industries, Inc. ("Farmland"), a Kansas corporation with its principal place of business in Missouri. Kaneb, a common carrier, piped the propane to Farmland. Farmland, as part of its business, in turn sold propane gas to its customers, one of which was the Coop.

Plaintiff filed in state court but the case was removed to the United States District Court in Nebraska by defendants Kaneb and Farmland based upon diversity of citizenship. The district court found that defendants were entitled to judgment as a matter of law upon determining there were no genuine issues of material fact.

## I. BACKGROUND

The circumstances surrounding the explosion are not contested by the parties, only liability.[3] The Coop was a fairly large corporation which maintained facilities

[2]The Coop was named as a defendant as required by Nebraska law to protect its subrogation interests resulting from a worker's compensation settlement.

[3]The district court's decision granting the defendants' motions for summary judgment and dismissing the estate's suit with prejudice fully and carefully

2

at several different locations in Nebraska.  It had its own liquified petroleum gas products department and a full-time department manager to supervise Coop employees who dealt with propane.  The propane was purchased from Farmland by the Coop, partly for its own use, and partly for resale in the regular course of the Coop's business to residential, agricultural, and industrial consumers.  The Coop, in the three-and-a-half months prior to the explosion, had purchased approximately 494,000 net gallons of propane.

The Coop maintained two 18,000-gallon bulk propane storage tanks for the propane, which would then be pumped into delivery trucks for retail sale.  The bulk tanks also supplied propane to two 1,000-gallon supply tanks that fueled the Coop's grain dryer.  A separate high pressure, underground propane pipeline approximately 300 feet long ran from the supply tanks to the grain dryer.  The line came out of the ground approximately 50 feet before it reached the dryer.

This propane line had been regularly pressure-tested by Coop employees each year up to and including 1993.  However, without explanation, this line was not pressure-tested in 1994, the year of the explosion.  In the past, the Coop had also checked the propane line for leaks with hand-held, electronic leak detectors, but

---

considered the facts which it set forth in greater detail.  *See* Crook v. Farmland Indus., Inc., 54 F.Supp. 2d 947, 948-56 (D. Neb. 1999).

discontinued their use prior to October 1994 because of the expense. The estate points out that a reliable electronic gas detector similar to a smoke detector was available prior to the accident, but not acquired for use by the Coop.

The explosion occurred at the Coop's Gresham facility where the decedent had been employed as the branch manager since 1987. He had worked for the Coop for 28 years. From 1975 to 1987, he had been branch manager at another of the Coop's facilities. One of his duties as branch manager was to develop training programs for employees under his supervision, depending on the requirements of the employee's particular position. The training program included employee Dan Noble, who for the past 22 years had been responsible for the use, hauling, and handling of propane gas. Noble served as the Coop's propane delivery truck driver and advised the Coop's customers as to the characteristics of propane and ethyl mercaptan. The Coop regularly sent Noble to safety seminars relating to the use and handling of propane.

Propane gas is a fuel which is used for both vehicles and a variety of appliances, such as barbeque grills, water heaters, and grain dryers. Liquid propane is stored under pressure in a tank or cylinder and is generally vaporized from a liquid to a gas before it leaves the container. Because liquid propane is odorless, colorless, and highly flammable, federal regulations, 29 C.F.R. § 173.315(b)(1), and

4

the Nebraska fire code required Kaneb, as a propane shipper, to place an odorant into the propane as a means of identifying a propane leak. The most commonly used odorant is ethyl mercaptan, which is used by ninety-five percent of propane sellers and shippers, and which was used in this case. This additive gives propane a distinctive smell which warns of the presence of propane. However, this odorant has limitations. Propane gas leaking from buried gas lines may lose its odor as it passes through the soil, thereby losing its effectiveness. This is known as odorant fade, which is what happened in this case.

Propane is heavier than air and does not dissipate as rapidly as natural gas, which, when leaking, may initially cause the propane to collect at low areas, such as basements. The underground pipeline connecting the storage tanks to the grain dryer apparently leaked propane which collected in the basement area of the Coop's nearby office building. Although some of the Coop employees were in and out of the basement on the morning of the explosion, no one detected any odor. Nevertheless, a little later in the day, a spark ignited the propane and caused an explosion, resulting in the death of the decedent. There is no disagreement that it was a case of odor fade. Nor is it disputed that the leak occurred around the threads in an underground pipe coupler, which was used to connect the two 1,000-gallon tanks to the grain dryer.

At this point, as we approach the issue of liability, the estate and the defendants disagree. The issues after the district court hearings became condensed into two liability theories, negligence and strict liability. More specifically, as stated by the estate, the two remaining issues are: first, whether "the district court erred in finding that the Coop and Kenneth Crook knew or should have known of the dangerous condition of the product and methods available to protect themselves," and secondly, whether "the district court erred in granting summary judgment in favor of defendants Kaneb and Farmland by finding they had no liability under Nebraska law if the Coop and Kenneth Crook knew or should have known of the dangerous condition of the product and methods that were available to protect themselves." This requires us to examine the basis of the district court's finding that the Coop and the decedent knew or should have known of the propane's dangers, and the district court's interpretation of applicable Nebraska law. The other available method of propane leak detection as alleged by the estate will be considered separately.

The "knew or should have known" issue requires some factual review of both the warnings given by the defendant and the knowledge of the decedent. We have already mentioned the decedent's long-term employment by the Coop and his duties as branch manager, including the responsibility for training the other four

6

employees at the Gresham facility. One of those employees under his direct supervision was Dan Noble, who was the "Propane and Grain Serviceman." Noble was responsible for hauling and handling propane gas for over 22 years. When first hired in 1976, he was instructed about the characteristics of propane. He knew it was pressurized, could not be detected without an additive to give it a detectable odor, would settle in low areas, and was dangerous if not handled properly.

In all, it was understood that propane could be a dangerous business, partly because of odor fade. Noble passed his knowledge of propane on to the Coop's customers. In addition to his long on-the-job training, he had attended a number of seminars since 1977 concerning the characteristics of propane and the problem of odor fade. Although the district court found that Noble was certified by the National Propane Gas Association as a specialist in the installation of propane piping, Noble's deposition was not clear about this certification. The estate argues Noble's deposition testimony was misleading and not sufficient for an undisputed finding of fact upon which to grant summary judgment. However, whether Noble was actually certified as to propane pipe installation or not is immaterial, as it is uncontested that he attended yearly propane safety seminars. Noble and several other employees were members of the Nebraska Petroleum Marketers, Inc., and/or the Nebraska Propane Gas Association. In 1993, Noble and three other Coop

7

employees attended a hazardous materials training workshop jointly-sponsored by those organizations. Noble also attended a two-day "Revised Certified Propane School" in February 1994 and a three-day "LP Gas School" in March 1994.

The record provides sufficient evidence that Noble had worked with the decedent on propane matters and discussed propane hazards, which included odor fade. Adding to their propane knowledge were safety mailings routinely distributed by Kaneb to shippers, customers of shippers, and carriers who received propane from Kaneb. The Coop received those materials as did Farmland. Kaneb's packets contained extensive warnings about propane, including warnings that propane is "**EXTREMELY FLAMMABLE**," may "ignite **EXPLOSIVELY**," and could be ignited by different sources, including "open flames, smoking material, electrical switches, pilot lights, sparks caused by friction, etc." (emphasis and capitalization in original). The warnings about odor fade were clear and stated, "THERE IS NO SINGLE ODORANT, OR ODORANT BLEND, KNOWN WHICH GIVES AN EFFECTIVE WARNING OF THE PRESENCE OF A PROPANE GAS LEAK IN EVERY POSSIBLE CIRCUMSTANCE" and that there is a "RISK OF DEATH OR A VERY SERIOUS INJURY CAUSED BY A PROPANE FLASHFIRE OR EXPLOSION." (emphasis and capitalization in original). The packet also specifically warned that propane leaking from buried

8

lines could lose its odor as it passed through the soil, as the soil absorbs the mercaptan odorant molecules. It also explained that under certain circumstances, not everyone is able detect the odor of ethyl mercaptan, even if the odor has not faded. For example, a common cold could affect a person's ability to detect the odor. The warnings stressed, "*A leak can exist even if there is no smell of gas.*" (emphasis in original). The use of gas detectors was suggested.

The warning literature was designed to not be easily ignored. Included in the safety packet was a "Safety and Warning Information Booklet for Propane Users," a glossy red and black booklet with multiple-type faces and boxed warnings, pictures, and diagrams, a pullout poster, and other photographs of fires and explosions. The record indicates that the Kaneb safety packets received by the Coop in 1992 and 1993 were placed on Mr. Crook's desk, and that he opened all of his mail himself. In addition, Kaneb's bill of lading, which accompanied each and every delivery of propane to the Coop, featured a "SEE REVERSE SIDE FOR ODORANT WARNING" on the front and a large-type, bold-face paragraph on the back which detailed the dangers of odor fade. In case of a suspected propane problem, the Coop was to call a trained professional.

## II. DISCUSSION

These warnings impress us as extensive and sufficient, but the district court

9

thought it unnecessary to reach the question of the adequacy of the warnings since those warnings might be at issue in other cases. We also see no need to come to a conclusion about the adequacy of the warnings as a separate issue, and we view the adequacy of the warnings only within the factual circumstances of this particular case, not in other circumstances. Whether the warnings would be adequate for inexperienced newcomers to the propane business we do not know, but combined with the experience and knowledge of Noble and the decedent, they are adequate. Under Nebraska law, a corporation is bound by the knowledge possessed by its employees or agents. *Grote v. Meyers Land & Cattle Co.*, 485 N.W.2d 748, 756-57 (Neb. 1992). Therefore, the knowledge of Noble as well as the decedent is imputed to the Coop.

Although we conclude that the warnings given in the particular circumstances of this case were adequate, as the district court found, under Nebraska law, no warnings of any kind are required in these circumstances because the defendants already knew or reasonably should have known of the dangers of propane. *See Strong v. E. I. DuPont de Nemours Co., Inc.*, 667 F.2d 682, 687 (8th Cir. 1981). *See also* W. Page Keeton, et al., *Prosser and Keeton on Torts* § 99 at 697 (5th ed. 1984); RESTATEMENT (SECOND) TORTS § 388 & cmt. k (1965). Based on its analysis of the RESTATEMENT § 388, the panel in *Strong* determined that "there is

10

no duty to warn if the user knows or should know of the potential danger, especially when the user is a professional who should be aware of the characteristics of the product." 667 F.2d at 687 (citations omitted). Noble, the decedent, and the Coop, claimed by plaintiff not to have been adequately warned, were experienced professionals in dealing with propane. This rule of the "sophisticated user" is no more than an expression of common sense as to why a party should not be liable when no warnings or inadequate warnings are given to one who already knows or could reasonably have been expected to know of the dangers of propane. Otherwise, it would be an effort to shift liability to one who had no duty to act. We expect the law in ordinary circumstances to apply a common sense rule. We need not again review the evidence, which, as we have stated, is sufficient to show knowledge of the dangerous properties of propane of the Coop, Noble, and the decedent.

The estate argues that there must be a showing of "actual knowledge" on the part of the Coop, Noble, and the decedent. Indeed, the evidence not only indicates those parties "should have known" of the possible dangers, but they could reasonably be viewed as having had "actual" knowledge as experienced professionals in the propane business. There were adequate warnings of "odor fade." The estate characterizes these warnings as "inadequate and misleading," but

11

it does not illustrate, or point out how the warnings could have been made adequate. The defendants' evidence is not required to be "crystal clear" as the estate suggests, and the estate offers no admissible evidence to the contrary.

The estate also argues that "knew and should have known" of the dangers was not the correct standard, asserting that the inquiry should have been: "Did the Coop, Noble, and the decedent have such 'specialized' knowledge as to relieve Kaneb and Farmland from the duty to warn?" However, the estate concedes that this argument was not raised in the district court, and is therefore waived. In addition, even were it to be considered, the evidence fairly considered can reasonably be viewed as showing that the Coop, Noble, and the decedent had "specialized" knowledge. Also, even had Kaneb and Farmland had a duty to warn, if a user is already aware of the dangers, the lack of warning is not the proximate cause of the injury. *See Strong*, 667 F.2d at 688 (citations omitted).

The estate further argues that a disclaimer on Farmland's sales contracts with the Coop, which stated that the Coop "is familiar with the properties of [propane] gas products and safe methods of handling them," should be given no evidentiary weight. To the contrary, the evidence suggests that the disclaimer is a true statement. The estate argues that "a warning must be designed to reasonably attract the attention of the user, give a fair indication of the specific risk involved and be of

12

an intensity commensurate with the magnitude of the risk involved." The estate maintains that a genuine issue of fact exists as to whether or not Kaneb met the criteria it claims are required. A mere review of those warnings is enough to answer that assertion, which is based on little more than argument, without any admissible evidence. The estate does not suggest how the warnings could have been specifically improved to meet its stated criteria. If the record indicated that the warnings misled the decedent by minimizing the dangers that would be a different issue. However, the warnings were not underplayed or obscure, but were plain and forceful. There was no admissible evidence to the contrary.

The estate also argues that Noble and the Coop were "not aware of the availability of a reliable, reasonably priced gas detectors prior to the accident." However, in its warning literature, Kaneb advised clients to consider the installation of electronic gas detectors as an extra measure of safety in case of gas leaks, noting that "Underwriters Laboratory-approved electronic hydrocarbon detectors designed for the detection of LP-gas in the home. . . . that emit a loud, shrill horn sound are now on the market a reasonable price." Kaneb also recommended that "[g]as detectors should be located near ground level to increase the likelihood of detection of escaping propane." That there was a gas detector on the market the Coop did not utilize, as unfortunate as that may have been, does not create liability.

13

The record clearly shows that the Coop and Noble were aware of, and had used, at least one type of gas detector. That the one previously used was not the best available does not impose liability by itself. Considering the experience and professional standing of the Coop, Noble, and the decedent, the continuing propane warnings, and the training about the dangers to all involved, we cannot assume or speculate in the absence of admissible evidence to the contrary, that the Coop, Noble, and the decedent did not know of the gas detectors availability.

We understand the good efforts of the estate in trying to make its case, but mere arguments cannot defeat an order of summary judgment fully supported by the law and the facts of record, even when viewed in the light most favorable to the estate. The facts support only one conclusion. *See, e.g.*, *McDonald v. McNeil Lab., Inc.,* 241 N.W.2d 822, 828 (Neb. 1976) (holding that where there is no essential conflict as to the facts and the evidence, the trial court was correct in refusing to submit the theory of strict liability to the jury). There are no triable issues of fact left to remand for jury determination.

## III.  CONCLUSION

The district court's order of summary judgment in favor of defendants is AFFIRMED. The parties shall bear their own costs.

14

A true copy.

Attest:

          CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.